Thank you, Your Honor, and may it please the Court, Fred Marcinak and I represent the appellant Stanley Partman. We're here today on an appeal from a number of convictions and sentences that occurred in the District of South Carolina. Mr. Partman was convicted of a number of offenses dealing with drug-related crimes and sentenced to 396 months of confinement. There are three issues that we raise on this appeal. The first issue is the sufficiency of the evidence to support Mr. Partman's conviction for possession of a firearm and furtherance of a drug-trafficking offense. This is 18 U.S.C. section 924c1a. There are four things the government says it proved in order to support this conviction. First that Mr. Partman had been sold cocaine by an individual named Woods and that this was bad cocaine. Secondly, that Mr. Partman threatened to shoot Mr. Woods. Thirdly, that Mr. Partman had or owned at some point in his possession two guns. And fourth, that Mr. Partman went to a barbershop where Mr. Woods worked with a gun in order to shoot Mr. Woods. We contend that the government fails to prove at least the last two elements or last two factors or pieces of evidence they say they can rely on. That Mr. Partman had two guns and that he went to a barbershop where he worked with a gun where Mr. Woods worked with a gun to shoot Mr. Woods. The first thing the government says it has proven in order to show that Mr. Partman possessed a firearm in furtherance of a drug-trafficking offense is that Mr. Partman went to a barbershop where Mr. Woods worked with a gun to shoot Mr. Woods. There's simply not sufficient evidence in the record to prove this contention that the government makes. The government relies on four pieces of evidence. It says, first of all, Partman made a statement to an individual named Reichard that he had a chopper in his truck. That's on page 263 of the appendix. Chopper is a word for machine gun. But the statement does not say that Mr. Partman entered the barbershop with a gun. It says he's riding around with a gun in his truck and he rode by a barbershop. Doesn't say that he went in the barbershop with a gun to shoot Mr. Woods. Secondly, the government says that Partman told someone that when he heard the barbershop had cameras in place, he said, I didn't know that. I would have shot Mr. Woods on camera. And that's on page 301 to 302. But again, that's not an admission that he entered a barbershop with a gun. It's somewhat puffery, made by Mr. Partman to another individual. It's him boasting about his drug trafficking. But it doesn't say he went in the barbershop with a gun. Thirdly, the government says, cites a statement, testimony from Mr. Thompson, that Mr. Partman wanted to go down to the barbershop that he was going, that he was at the barbershop with an assault rifle looking for Mr. Woods. And that's on page 495. But again, the statement says he wanted to go to the barbershop, not that he had done so, but that he wanted to go to the barbershop with a gun. And so, again, it's not evidence that he went in the barbershop with a gun to shoot Mr. Woods. Is that necessary, or is it enough simply that he threatened to use it in the manner described by the government's evidence? Well, I don't think it's enough that he threatened to use a gun, Your Honor, because as we'll, as I'll explain, there's no testimony at any time that Mr. Partman actually, the idea that he had a gun, there are statements in which he boasts about having a gun and says he's going to use a gun, but no one ever saw this gun. This gun was never found. That's what I'm asking. Is that required? Well, that goes to the possession of the gun. We contend there's no evidence that he actually possessed a gun. So I think it is required under the statute that a gun be possessed and used in furtherance. And so those are the two elements under the statute. Here, there's no evidence, really, that either one of those elements was met, because the only thing in the record as far as the gun is Mr. Partman's boasting as a drug dealer to his cohorts about having a gun and that he was going to use it. There's no, no one ever saw a gun. A gun was never found. There's really no evidence beyond his boasting that there was ever possession of a gun. There was no gun used or carried in connection with any drug offense. So we don't think the threats in these circumstances provide enough evidence. Well, the problem is, as you know, on a sufficiency challenge, all the inferences have to be drawn in favor of the government. And the fact that Mr. Partman boasts about having a gun is pretty significant. Your Honor. Yes, Your Honor. It's a tough standard. It's a tough standard. I would submit that in regard to the standard, there is no case cited by the government that has had this little evidence of possession of a gun in furtherance of a drug crime. The government cites a number of cases that it says support its position. None of those cases has the dearth of evidence that this case has. In United States v. Rio, which we cited in our brief, the court said mere ownership of sufficient to convict for possession in furtherance of a drug offense. Mere ownership is not enough. Here the government has not even proven ownership. We have some boasting about there being a gun. In this case, and similarly in United States v. Jeffers, that the government cites, the defendant there had been supplied with a gun and he was seen carrying the gun and using the gun. Here, what does the evidence show? No one saw Mr. Partman taking a gun in the barbershop. No one saw him. The one witness that they presented who saw Mr. Partman go in the barbershop said, I never saw him bring a gun in the barbershop. He testified to that. He said, I didn't see him bring a gun in the barbershop. No one saw him take a gun in the barbershop. Beyond the barbershop, no one even knew whether Mr. Partman owned one. Thompson said, I saw a gun back in 2005 in Partman's apartment, six years before the criminal activity that Mr. Partman was charged with here. No one knew whether he owned one at the time of this criminal activity. No guns were seized. Even after the high-speed chase after which Mr. Partman was arrested, when he was throwing cocaine out the windows and the police went back and found all that cocaine, no gun was found. No gun was found and seized by the police. No guns were found in the vehicle. Everyone heard that Mr. Partman had guns. No one ever saw the guns. This court has been strict on the application of 924C. The reason is because this statute takes a legal activity, owning a firearm, which is perfectly legal, and makes it illegal. It says if you possess a firearm, a legal activity, possession of a firearm, and you do something with it, that's going to become illegal. Of course, you're disavowing any possession at all. That's not the element you're saying your client didn't possess the weapon. We don't. We don't. Correct, Judge Diaz. We think the evidence here, there's no evidence that he possessed it beyond his boasting, but even assuming that he did possess one, which is legal, this court has been strict on saying you've got to do something more. You've got to show some furtherance to make that activity illegal. I thought that there is testimony, there are recorded telephone calls in which Partman is heard acknowledging that he has a firearm and is attempting to locate Woods to shoot him because of the bad cocaine, beginning around pages 260 to 268 in the Joint Appendix. There are, and Your Honor, there are some questions about the accuracy of those recordings, but even granted, if those recordings are accurate, again, I've been very careful to say beyond Mr. Partman's own what I would call boasting, there's no evidence. So yes, there are recordings of him saying, I've got a gun, he calls it a chopper at times, I've got it with me, I'm going to go shoot Mr. Woods. You say boasting, the government says admissions. I mean, the problem is, again, the standard. Every inference drawn in favor of the government suggests that he possessed the weapon. It's a tough standard, but again, it's not possession alone. Let's even, assuming they prove possession, the court has been very strict with this section by saying if you're going to take a legal possession of a firearm and make it a crime, we're going to strictly require that you show that it was used in furtherance of a drug trafficking offense. Well, to shoot Woods because of bad cocaine? Because that was the subject of some of the recordings. And the question is whether he used the firearm in furtherance, and the government has attempted to argue that that establishes that he did. But what's the evidence that he did that? He told people he was going to do that. He said, he talked about wanting to do that. There's no evidence that he ever did anything about that. He went in a barbershop to find Woods, and the only witness who saw him said he didn't have a gun. Well, you know, that goes back to Judge Diaz's earlier question when he asked, you were saying there's no possession. I mean, on the one hand, you're saying that there's a slew of cases, and you're correct, there's no case that I found in which somebody didn't at least see a gun or there was a gun put in. But here, it seems to be pretty clear, at least from the indication of his own statement, the possession of a gun. So he possesses a gun. So if you then get to that part, then you get into the furtherance of a drug traffic. If you look at that separately, he's telling someone he's going to use this gun he possessed to kill someone. And that seems to connect those dots. I mean, if you had to, if you were going, it seems like your argument is really going at the possession of the gun. There's nothing to show he possessed a gun. He had a coat on. You don't know what they say. It was bucky. No one saw a gun. There was no evidence of a gun. He said, I had a gun, but that was boasting. But it's pretty clear, at least from your statement, you said assume he possessed it. Well, we assume that. And all we're left with is in furtherance of drug traffic. And he tells it in this conversation. Well, Your Honor, if the court is going to relax the standard of what it's required in the past for the in furtherance element and say that possessing a gun and making statements that the gun is going to be used, if that's enough for in furtherance, then we probably lose this appeal. Because he definitely, if the government's proven possession, and if him saying I'm going to use this gun to do something is enough to prove in furtherance, then we probably lose this appeal. But even if you win this, he's not exactly coming out of jail anytime soon. I mean, this is the five years. This all goes to the 60-month consecutive sentence. This added, this conviction added five years consecutive onto his sentence. And so, again, if possessing a gun and saying I'm going to do something with it is furtherance, then we probably lose this appeal. I thought the government presented evidence that the victim somehow got wind of the threat and in response armed himself to defend against the threat. Is that not in the record? I may not be remembering, but I don't remember that being in the record. I mean, the government at page 35 of its brief says that it's clear that Partman's threats and his admitted possession of a weapon had the desired effect of scaring Woods, who armed himself because he feared that Partman would follow through on his threat. So that seems to connect the dots even more solidly in favor of the government. Again, Your Honor, and I misheard your question. Yes, he did. There is evidence that he armed himself. Again, there's evidence from all of these folks that they were always armed because they were in the drug trafficking community. So whether it was in response to this, I don't know, but he was apparently always armed. But again, if having a gun and saying I'm going to do something with it is enough for furtherance, we would argue that the cases have always required more that the gun be employed in some manner. And that didn't. There's no evidence of that here. So we would have to wait until Mr. Partman shot Mr. Woods? Well, or that he employed the gun in some manner. If he had, if there were evidence that he took the gun into the barbershop with him, then that may be enough. But the witness said he didn't have the gun with him. No one ever saw this gun being used in any way. And we simply contend that under a statute that this Court has strictly construed, that that's not enough. Mr. Marcinek, you've used up your time, but you have reserved a considerable amount for rebuttal. Yes, and I have a couple other issues that we raise on this appeal, and I can address those in rebuttal. Thank you. Thank you very much. Mr. Daly? If I may please the Court, Robert Daly on behalf of the United States. Judge Diaz, you are correct. In response to the threats, Mr. Woods, the barber, did actually said that that's when he got strapped, is I think what the testimony is. There's a couple different places. One fact... He was strapped all the time. Well, he may have been strapped all the time. He wasn't exactly somebody who hadn't been involved in this before. That's what this case is about, a bunch of drug dealers out there. So, the fact that he went out and strapped himself with this, it was probably he reached down in his bag and put it on, he had it the whole time. Maybe with his hair clippers, he has a gun right by it, I think. This case is the sort of quintessential drug conspiracy. There are lots of folks, in fact, we had another appeal up here yesterday involving some similar... It went for a long time. This, apparently, what you're alleging here with all these defendants, these individuals, this went for an incredibly long time. It did. In fact, at one point, if you look at the history, Mr. Partman at one point is the supplier, and I don't know if he fell on hard times, but then he becomes the buyer, and he becomes the buyer of substandard cocaine in this instance. He's not able even to assure the quality, and that's really what the case is about. He wanted to assure that people understood, you're not going to short me. You're not going to give me a bunch of bad cocaine. One point that counsel... So is the counsel on the other side correct that all we need to do is, once we say he's possessed it, that just talking about how he's going to use it going to be enough? Well, I think that using, having the gun, and then possessing it, and then in furtherance of, what's in furtherance of? I think that a threat, a valid threat, a continuous threat, caught on wire, the thing that's unique about this case is we don't have to guess about what the language was exactly he was using. We know exactly what he was saying, and in real time, he's saying, I just went by the barbershop with my chopper, and I want to put 50 rounds in him, and he ain't there, and it just so happens, at the same time, a barber sees somebody matching his description come in with a big bulky jacket. It's not uncommon. He's matching his description. And it's not uncommon. If you have an AK-47... But I want to know that answer. I'm sorry. The barber who says he saw this person coming in, did he ever say he matched the description of the defendant? I don't think that's in the testimony. I think... Well, I know this... He's identified him. He said a person came in with guns. Nobody asked him. Well, he could have. Did he look like the defendant or something? It could have been. No, nobody did. And was it unusual for someone to come in for Woods with a gun? I mean, he was in the business. So someone coming in looking for him, doesn't the record show there were other folks looking for him, too? There was... There's nothing in the record that anybody was looking for him during that time frame, and there is specific evidence saying that Mr. Partman was looking for him and was going to find him and was going to Google him and find where he lived, and there's... Well, we have to infer from that that no one else was looking for this known drug dealer and supplier who was in the barber shop with his gun and just constantly involved in these dealings, and he had given this defendant, quote, bad cocaine, which would indicate he could have given somebody else some bad cocaine who might have come after him. He could have. But, I mean, again, in the light most favorable to the government, this is the same time... But the light most favorable to the government cannot go without recognition of the other things that are there. I mean, we don't just exclude common sense from this equation. I mean, yeah, the light most favorable is good, but even in the light most favorable, those facts still exist. They do. I mean, you certainly could conjure up the possibility, yeah, that another person was looking for him. I'm not going to discount that. I like the word conjure, because that could be inference, too, you know, conjure. Well, conjure is a little more magical, I think, than concrete. One thing I wanted to mention, though, is there's a very important fact, though, that makes possession not an issue. Twice, well, I think it was in the same proffer session, debriefing of the police, at page 560 and 561, I believe, in 577, he admits, there's no reason for him to puff at this point, he tells the police, a SLED agent and an FBI agent, that he got the AK-47 and I think a .308 caliber rifle. When he got shorted, when he thought he got the bad cocaine, he went and got those guns. That's what he said in response to that. And that completely lines up with what he said in his conversations over the phone that were caught on wire, that he got these guns for the specific purpose of straightening things out. And that alone is sufficient. I believe it is. I mean, we have other corroborating evidence. Any case ever come out that way? I mean, all the cases I've seen look like somebody at least saw a gun or a gun was introduced. I've never seen a case where someone just says, I got a gun, because they kind of do that all the time, I would think. In this world that they live in, I'm going to go and shoot someone, probably comes off their lips all the time. Will that lead to a conviction of possession, a firearm, in furtherance of drug activity, merely, not merely, but just based upon a statement that is introduced to say, I had a gun and I was going to go and shoot him. Perhaps based upon a single statement, I think we'd have a problem. How many do we need? Well, an admission to law enforcement that you possess a gun, I think is pretty strong. One admission to law enforcement. Under circumstances where he'd want to be telling the truth in a proffer, and where he got himself in trouble, I mean, I think it's in a footnote, is they then, but he said, well, I didn't go into the barber shop with the gun, and that's where he failed to polygraph. I mean, ironically, that's what led to the proffer coming in. So it's a, what's interesting is the case law says you don't have to introduce the gun. And the case law also says you don't have to actually see the gun. But I don't know that I've seen a case that says, okay, neither one of those happened in this case. But I've also never seen a case with the kind of discussions of having a gun on a wire in real time with actions that were consistent with that, which of course led everybody in this conspiracy to realize Hartman's got a gun, and we better watch out. Does threatening alone do it? Will just simply threatening an individual to use a gun because they sold him bad cocaine, would that alone do it? Even if he had no gun. It's almost like counterfeit cocaine, you know? You can convict him of cocaine even though it's not the real thing. So what if he doesn't even have a gun? Will the threats alone do it? Would only a threat, no, no. And a statement that I have a gun, I'm going to shoot him. All that's in his statement. But there's nothing else there. In discussing this, getting ready for this argument, that's a tougher question. That's not this case. But it is a tougher question. What additional do you say is this case? All the corroborating evidence around and his name. You mean the fact that you've got the culture of him? And we've got, he's used the gun, obviously he uses guns with some frequency. A gun was seen back in 2005 or 6 when he shot at the people that tried to rob him a year or two later in a car chase. He admits. The fact that he's done it before is your, is capable of doing it. Is capable of doing it and has done it. I mean it's clearly, and that was evidence before the jury as well. This is, it's not as slam dunk a case as if we actually had somebody who saw the gun. People don't usually want to expose an AK-47 Decker Boulevard with this. I'm just wondering where does it go in terms of future convictions of this type? I mean because these kinds of statements fly out all the time. And if you don't have to actually have a gun or someone to actually see a gun, then the statements alone get you there. And even with him so-called coming into barbershop, for some reason nobody ever asked him who was that guy that came in there or described, didn't say he was big, he was, this looked like, well the defendant's probably sitting right there, I think the witness testified. I don't know why he didn't say is that the guy right there, unless he was going to say it wasn't, then you wouldn't have asked that and the defendant didn't know that he was going to do that. So I don't know. Not in the record. I wasn't, I wasn't at the trial. I don't know why you would. I believe this was a very reluctant witness who was concerned about, you know, his safety. Anyway, but that's not in the record, Your Honor. I don't want to. But the bottom line is, at least insofar as coming in the barbershop, you have the naked testimony that somebody walked in there without identifying that it was this defendant. And you have it under the circumstance that where he's going is with a known drug supplier who is known to be armed, has been in this business for years, has had other threats against him, and someone says somebody came in here with a big coat, didn't see anything, just said they had a big coat. Well, had a big coat, was asking about him, went straight to. Asking about this drug supplier who gives out bad cocaine or whatever. Well, but we only know about this one instance. There's nothing in the record that he was a consistent bad cocaine supplier. I mean, this is the, this is the one thing we do have. But it is in the record that he was a consistent cocaine supplier, and he was supplying it to people who we, I guess we can take the notice that they are not exactly choir boys these signs, these notice boards. I would not go to get my hair cut at this barbershop, Your Honor. All right. Duncan has a question. I'm happy to answer either of the questions on the other two issues if you want to. However, he didn't address it, I'd just rest on our briefs unless you have any specific questions about those two issues. I think we understand your argument. Thank you very much. Thank you. Thank you very much. I think on the first argument we've exhausted our discussion on that, unless anyone has any further questions on that. On the second issue, two issues, additional issues we raised, and I at least want to get our argument before you on those. The first issue is the issue of the qualification of the jury panel in this case. There were, at the jury selection, Mr. Partman was dressed in prison uniform. Slacks. Correct. A plaid shirt with prison slacks and slippers. So there's no question that he was wearing that clothing. The only question is whether that prejudiced the jury panel, and the jury panel should have been disqualified. Is there any evidence that he would not have been permitted to wear other attire? His attorney gave him the shirt to wear. Why didn't the attorney give him pants? I guess my question is, is there anything that suggests that he would not have been I believe the record is silent on that. We simply don't know what the answer to that question is. The I think the first objection was raised after the jury had been selected, not before. The argument here is that there were three jurors who remembered something about Mr. Partman's clothing. Three jurors who remembered something about his clothing. Two of those, the court disqualified two of those jurors and seated alternates in their places. So the court recognized there was a basis to disqualify these jurors, and it disqualified two of them, and it seated two alternates. The court did not disqualify the third juror who remembered the color of the clothing simply because there was not another alternate who could take that juror's place. And so we contend that under those circumstances, there's no reasonable difference between the two jurors who were excluded. I didn't think that was it. I thought the third person wasn't wasn't sure about what he saw. He said he maybe, maybe saw. Third juror said he that he was wearing something that it might have been orange. I believe that's what he said. He said I wasn't. I mean, I think he even phrased it as a question. He said, he said, was it orange? I think is what the exact way he phrased it. So, yes, there's a difference in the phraseology between what the three remembered. But one of the jurors who responded said he remembered seeing an orange or reddish jumpsuit. And so, again, we would say they both remembered similar things. The court disqualified one and not the other because it didn't have an alternate to replace that third one with. And under those circumstances, when the court has recognized that there's a potential for prejudice, the court should have disqualified the jury panel. And the only thing that I was taking exception with was your characterization that the district court did it because there wasn't another alternate. When there was a qualitative difference in the third juror's response, the third juror says, and this is a direct quote, was it something orange maybe? Whereas 129 recalled Hartman wearing an orange or red something jumpsuit. And then 130, one of them said scrubs like court issued or correctional issued. And those two were excluded. But the one who wasn't excluded said, was it something orange maybe? Your Honor, that's correct. There was a difference in the statements that the jurors made. We would contend, though, that at the end of the day, that that third juror should have been excluded, which would have required a selection of a new panel. Well, maybe at the beginning of the day, his lawyer should have given him a pair of slacks to go with the shirt. That would have resolved this issue. Yes, that's correct, Your Honor. The third issue that we raise is the application of the obstruction of justice enhancement. Your Honor, the court has been very strict on application of this enhancement. And in United States v. Thorson, this court said, to satisfy the requirements of this enhancement, the defendant's obstructive conduct must have been willful, meaning that he must have consciously acted with the purpose of obstructing justice. The willful element is essential. In United States v. Brown, the Second Circuit said this enhancement is appropriate only if the district court makes a finding that defendant had the specific intent to obstruct justice. In this case, the district court made no such finding of specific intent to obstruct justice or of specific willfulness. And so we would contend that that warrants reversal on this ground. But what's the import of that if the district court also indicated that regardless of whether he was right or wrong on that enhancement, his sentence would not have changed? We believe that the obstruction enhancement was not harmless for these reasons. There are two problems with that statement that the district court made. The district court did give what I would characterize as a catch-all statement to say, I would have sentenced him to the same thing at the end of the day anyway. Two problems with that. Well, he did more than that. He went into, I think, great detail explaining why. He gave reasons. And I'd like to address that. There are two problems why the district court's statement that he would have given the same sentence, two problems with that statement. First of all, this would mean that the sentence would have been a variant sentence. Because without the obstruction enhancement to give this sentence, he would have varied upward from the guidelines. But earlier in the sentencing hearing, the district court had already said a guideline sentence is an appropriate sentence. And so on the one hand, the district judge says a guideline sentence is appropriate, but I would give a variant sentence even without the obstruction of justice enhancement. And the problem with that is, if a guideline sentence is appropriate, then a variant sentence in excess of the guidelines violates the sentencing statute because it's a sentence that is greater than necessary to achieve the sentencing factors under 3553A. And so you can't say a guideline sentence is appropriate, but I would give a variant sentence for these reasons. And so the sentence then becomes greater than necessary to achieve the sentencing goals. And so that's the... Your challenge is you're saying that the sentence was procedurally unreasonable. Would be procedurally and substantively unreasonable because it would be a sentence that was greater than necessary to achieve the sentencing goals which the district court had already found were appropriately met by the guideline sentence. And if I might briefly state the second point on this, Your Honor, my time's expired. You may have two sentences. Okay. The factors that the judge had found justified the variant sentence that Judge Diaz mentioned earlier were already captured in the guideline sentence itself, so they can't be double counted to support the variance.  That was one sentence. Congratulations. Thank you, Your Honor. I think we may have seen you before, Mr. Marcinak, have we not? Yes, Your Honor. And I noticed that your service is court-appointed and the court would like to thank you. We could not cope with these cases without your able assistance. Thank you, Your Honor. We'll come down and greet counsel and proceed directly to the last case.
judges: Allyson K. Duncan, James A. Wynn, Jr., Albert Diaz